**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**GARRETT D. MILLS,**

        **Plaintiff,**

**v.**                                    **Case No. 3:13-cv-06421**

**CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,**

        **Defendant.**

## MEMORANDUM OPINION

This is an action seeking review of the decision of the Commissioner of the Social Security Administration (hereinafter the "Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The case is presently before the Court on the parties' motions for judgment on the pleadings. (ECF Nos. 11, 12). Both parties have consented in writing to a decision by the United States Magistrate Judge. (ECF Nos. 7, 8). The Court has fully considered the evidence and the arguments of counsel. For the reasons that follow, the Court **FINDS** that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

## I.    Procedural History

Plaintiff, Garrett D. Mills ("Claimant"), filed for DIB and SSI on December 18, 2009 and February 19, 2010, respectively. (Tr. at 154, 158). Claimant alleged a disability

onset date of September 10, 2009, (*id.*), due to "carpal tunnel spine and back sleep and social disorders." (Tr. at 178). The Social Security Administration ("SSA") denied the applications initially and upon reconsideration. (Tr. at 67-76, 81-94). Claimant filed a request for a hearing, (Tr. at 95), which was held on September 22, 2011 before the Honorable George D. Roscoe, Administrative Law Judge ("ALJ"). (Tr. at 26-59). By written decision dated October 20, 2011, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 10-21). The ALJ's decision became the final decision of the Commissioner on January 22, 2013, when the Appeals Council denied Claimant's request for review. (Tr. at 1-3).

On March 27, 2013, Claimant filed the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an Answer and a Transcript of the proceedings on June 3, 2013. (ECF Nos. 9, 10). Thereafter, the parties filed their briefs in support of judgment on the pleadings. (ECF Nos. 11, 12). Accordingly, this matter is ripe for resolution.

## II.   Claimant's Background

Claimant was 30 years old at the time of his alleged onset of disability and 32 years old on the date of the ALJ's decision. (Tr. at 20, 30). He attended school through eleventh grade, subsequently received a GED, and communicates in English. (Tr. at 31-32). Claimant has prior work experience performing manual labor and working in retail sales. (Tr. at 32, 180, 191-96).

## III.   Summary of ALJ's Findings

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity

by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). First, the ALJ determines whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). Second, if the claimant is not gainfully employed, then the inquiry is whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). Third, if the claimant suffers from a severe impairment, the ALJ determines whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If the impairment does meet or equal a listed impairment, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). In the fourth step, the ALJ ascertains whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability and the burden shifts to the Commissioner to prove the final step. *McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). Under the fifth and final inquiry, the

Commissioner must demonstrate that the claimant is able to perform other forms of substantial gainful activity, while taking into account the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the ALJ "must follow a special technique" when assessing disability. 20 C.F.R. §§ 404.1520a, 416.920a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If such impairment exists, the ALJ documents the findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in the Regulations. *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the degree of functional limitation against the

criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id. §*§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment that neither meets nor equals a listed mental disorder, then the ALJ assesses the claimant's residual function. 20 C.F.R. §§ 404.1520a(d)(3), 416.920a(d)(3).

In this case, the ALJ determined as a preliminary matter that Claimant met the insured status requirements of the Social Security Act through December 31, 2009. (Tr. at 12, Finding No. 1). The ALJ acknowledged that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since September 10, 2009, the alleged disability onset date. (*Id.*, Finding No. 2). Under the second inquiry, the ALJ found that Claimant suffered from severe impairments of "degenerative disc disease of the lumbosacral spine, carpal tunnel syndrome, degenerative joint disease of the knees, history of seizure disorder, and obesity." (Tr. at 12-15, Finding No. 3). However, the ALJ found that Claimant's alleged depression, difficulty hearing, and sleeping disorder were all nonsevere. (Tr. at 13-15). Under the third inquiry, the ALJ concluded that Claimant's impairments, either individually or in combination, failed to meet or medically equal any of the listed impairments. (Tr. at 15, Finding No. 4). Consequently, the ALJ determined that Claimant had the RFC to:

> [P]erform light work (20 C.F.R. 404.1567 and 416.967) with the additional nonexertional limitations: the claimant cannot climb ladders, ropes and scaffolds; can occasionally climb ramps and stairs and can occasionally balance, stoop, kneel, crouch and crawl; cannot work at heights or on steep, narrow, wet or erratically moving surfaces; cannot perform repetitive or constant fine finger manipulation; and cannot have concentrated exposure to cold temperatures or vibration, or any exposure to hazards such as heights and machinery (20 C.F.R. 404.1569a and 416.969a).

(Tr. at 15-20, Finding No. 5). Based upon the RFC assessment, the ALJ determined at the fourth step that Claimant was unable to perform any past relevant work. (Tr. at 20, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine if he would be able to engage in substantial gainful activity. (Tr. at 20-21, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1979 and was defined as a younger individual; (2) he had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the disability determination. (Tr. at 20, Finding Nos. 7-9). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that exist in significant numbers in the national economy. (Tr. at 20-21, Finding No. 10). At the light level, Claimant could work as a route aid, school bus monitor, or house sitter; and at the sedentary level, Claimant could work as a credit card information verifier, surveillance system monitor, or product inspector. (Tr. at 21). Therefore, the ALJ concluded that Claimant was not disabled as defined in the Social Security Act, and was not entitled to benefits. (*Id.*, Finding No. 11).

## IV.    **Claimant's Challenge to the Commissioner's Decision**

Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ failed to properly evaluate Claimant's credibility. (ECF No. 11). Moreover, Claimant contends that the objective evidence clearly substantiates his allegations of disabling impairments.

## V.    **Relevant Medical Records**

The Court has reviewed the transcript of proceedings in its entirety including the medical records in evidence. The Court has confined its summary of Claimant's

treatment and evaluations to those entries most relevant to the issues in dispute.

### A. Treatment Records

#### 1. 2005-2006

On August 22, 2005, Claimant was referred to Glen P. Imlay, M.D. at Holzer Clinic with complaints of low back pain dating back to age 16, as well as aggravating hand pain and numbness. (Tr. at 287). Claimant reported that his back pain radiated down his left leg to his knee and that Percocet helped relieve pain but Lortab did not. (*Id.*). Claimant was observed to walk "with an antalgic gait favoring a flexed position." (Tr. at 288). Physical examination revealed decreased lumbar range of motion with somewhat better flexion than extension, and Dr. Imlay noted that "his flexion was painful and when we tried to examine, extension was more painful, particularly to the left side." (Tr. at 288). Claimant was "tight in two-joint muscles and [was] difficult to move as such because of the pain in the back." (*Id.*). Palpation at Claimant's "SI joint and L5-S1 area was most tender," while his gluteal muscle was also "tender to palpation, which was increased with the hip extension and there were some trigger points noted in the gluteal region as well." (*Id.*). Claimant's spine MRI showed "disk degeneration as well as some general narrowing in the spine." (*Id.*). At L4-L5, there was a "broad-based small +2 post central protrusion," while at L5-S1 there was a "medial anterior thecal sac, just occurring at the L5-S1, which was a budding S1 nerve root." (*Id.*). Claimant's upper extremity EMG revealed electrophysiologic evidence of "moderate right median nerve entrapment of the wrist (CTS) involving sensory and motor fibers" and "mild left median nerve entrapment of the wrist (CTS) involving sensory fibers only." (Tr. at 290).

Accordingly, Dr. Imlay assessed Claimant with "suspected bilateral carpel tunnel syndrome," "sac into the left leg with MRI showing thecal sac at the L5-S1 more

prominent on the right with a disk protrusion moderate in size at L4-L5," "SI joint pain," "lumbosacral sprain/strain," "gluteal enthesitis," and "suspected carpal tunnel syndrome." (Tr. at 288). Dr. Imlay ordered an MRI contrast of Claimant's back and an EMG of his lower extremity; ordered a right wrist splint for him to wear; prescribed Neurontin and Percocet; and instructed Claimant to return in three to four months. (Tr. at 288-89).

Claimant's September 8, 2005 lumbar spine MRI with contrast revealed "stable L3-4, L4-5 and L5-S1 degenerative disc disease." (Tr. at 296). There was "moderate canal stenosis with symmetric lateral recess involvement at L4-5" but "no enhancement associated with the 1cm cystic structure adjacent to the right S1 nerve root." (*Id.*). Claimant's September 14, 2005 lower extremity EMG revealed no electrophysiologic evidence of either "left lumbosacral radiculopathy or plexopathy" or of "bilateral peroneal or sural peripheral neuropathy." (Tr. at 297).

On October 12, 2005, Claimant attended a follow-up appointment with Dr. Imlay. (Tr. at 301). Claimant complained of "having the same symptoms" since his last visit, including stiffness in the morning. (*Id.*). Claimant reported that his pain medication helped somewhat, as did his wrist splint, but that he was "still having the back pain and gets symptoms that seem to go into his left hip area as well as sometimes down the leg." (*Id.*). Physical examination revealed that Claimant's left gluteal area was particularly tender to palpation, as "as well as the L5, S1 area on the iliac crest," and that Claimant's "gluteal muscles [were] also tender to palpation." (*Id.*). Claimant was assessed with "right carpal tunnel syndrome improved with wrist splints," "mild central disc protrusion at L4, L5 with moderate canal stenosis. Patient with sciatic type symptoms into the left lower extremity. Nerve root cyst noted ablating the right S1 nerve root," "SI

joint pain," "lumbosacral sprain/strain particularly on the left," and "left gluteal antithesis with left gluteal myofascial pain." (*Id.*).

On December 1, 2005, Claimant attended a follow-up appointment with Dr. Imlay. (Tr. at 302). Claimant reported that he had run out of Percocet, and that the Duragesic patch had been helpful in the past. (Tr. at 302). Physical examination revealed that Claimant's "lumbar range of motion [was] decreased because of pain" and that the "L5/S1 area was the most tender." (*Id.*). Claimant was assessed with "right carpal tunnel syndrome improved with wrist splints," "mild central disc protrusion at L4/L5 with moderate canal stenosis," "patient with radicular type symptoms in the left lower extremity," "SI joint pain," "lumbosacral sprain, strain," and "left gluteal myofascial pain, gluteal enthesis." (*Id.*).

On January 12, 2006, Claimant attended a follow-up appointment with Dr. Imlay. (Tr. at 303-04). Claimant reported that he could not afford Duragesic or Neurontin, but that the Lortab helped although less than Percocet. (Tr. at 303). Physical examination reflected that "[p]alpation at L5-S1 area was the most tender" and that Claimant "had limited ability to range his back." (*Id.*). Claimant was assessed with "right carpal tunnel syndrome, improved with wrist splints," "mild central disk protrusion at L4-L5 with moderate canal stenosis," "S1 radicular pains in the left lower extremity" with "changes affecting the right S1 nerve root," "SI joint pain," "lumbosacral sprain/strain," and "gluteal myofascial pain and gluteal enthesitis." (*Id.*).  Dr. Imlay prescribed Percocet, Sulindac, and Doxepin, and instructed Claimant to follow-up in six weeks. (Tr. at 304).

On April 5, 2006, Claimant attended a follow-up appointment with Dr. Imlay. (Tr. at 306). Claimant reported running out of Percocet, and that Ultram had not helped

him. (*Id.*). Physical examination revealed "[p]alpation along the L5-S1 area with some tenderness" and that Claimant's "[l]umbar range of motion was limited." (*Id.*). Claimant was assessed with "right carpal tunnel syndrome stable with wrist splints," "right central disc protrusion L4-L5 with moderate canal stenosis," "SI radicular pains in the left lower extremity with MRI showing some right S1 nerve root involvement," "sacroiliac joint pain," "lumbosacral sprain/strain," "gluteal myofascial pain enthesis," and "failed appointment." (*Id.*). Dr. Imlay prescribed Lortab, ordered a drug screen, and instructed Claimant to return in 6 to 8 weeks. (*Id.*). Claimant's drug screen was positive for cannabinoids, opiates, and oxycodone. (Tr. at 305.).

### 2. 2010-2011

On September 27, 2010, Claimant attended an initial appointment to establish care with Dawn McFarland, M.D. (Tr. at 309-12). Claimant complained of migraines over the past several years; pain, swelling, and stiffness in his hands and elbows; anxiousness and insomnia; and itchy/watery eyes. (Tr. at 309). Claimant reported experiencing carpal tunnel syndrome in his right more than left side, numbness when he sleeps in his left arm, and right hand aches. (Tr. at 312). Claimant reported dropping things bilaterally, and stated that he wears a wrist brace at times. (*Id.*). Physical examination reflected decreased range of motion and crepitance in Claimant's right knee. (Tr. at 312). Claimant was diagnosed with "back pain – spinal stenosis," "paresthesias – legs," and "carpal tunnel bilat UE's." (*Id.*).

On October 8, 2010, Claimant attended a follow-up appointment with Dr. McFarland, in which he requested an increase in Percocet, as well as "something for sleep." (Tr. at 316). Claimant complained of his knees bothering him, especially his right knee. (*Id.*). Claimant was diagnosed with low back pain, paresthesia, CTS bilateral, and

tobacco use. (*Id.*). Dr. McFarland ordered an MRI of Claimant's spine and x-rays of his knees, increased his Percocet dosage, and prescribed a Trazodone trial. (*Id.*). Claimant's spine x-ray results, dated October 15, 2010, reflected "disc space height loss at L4-5," resulting in an impression of "degenerative disc changes at L4-5." (Tr. at 321). Claimant's chest, hands, and knees x-ray results, dated October 20, 2010, revealed no abnormalities. (Tr. at 320).

On December 14, 2010, Claimant attended a follow-up appointment with Dr. McFarland. (Tr. at 315). Claimant reported that Trazodone did not help, requested Xanax for his nerves and insomnia, reported taking 5-6 Percocet per day, and reported that Neurontin continued to help some. (*Id.*). Physical examination reflected decreased range of motion, cyanosis, edema, and crepitance of his right knee. (*Id.*). Claimant was diagnosed with carpal tunnel syndrome, low back pain, insomnia, and bilateral knee pain. (*Id.*). Dr. McFarland ordered a bilateral knee MRI, prescribed Cymbalta and Xanax, and increased Claimant's Neurontin dosage. (*Id.*).

On April 11, 2011, Claimant was seen by Dr. McFarland "to start urine stream." (Tr. at 314). He also reported that "Xanax and Neurontin seem to help with relaxing." (*Id.*). Claimant was assessed with carpal tunnel syndrome, low back pain, and PSA. (*Id.*).

On August 11, 2011, Claimant attended a follow-up appointment with Dr. McFarland in which he requested that his Xanax dosage be increased due to insomnia. (Tr. at 313). A problem list, also dated August 11, 2011, indicates that Claimant continued to suffer from spinal stenosis, bilateral carpal tunnel in his wrists, bilateral knee pain, and insomnia. (Tr. at 308).

### B. Agency Evaluations and RFC Opinions

#### 1. Mental Evaluations

On May 4, 2010, Penny O. Perdue, M.A. of Associates in Psychology and Therapy, Inc. completed a mental evaluation of Claimant, consisting of a clinical interview and mental status examination. (Tr. at 235-38). During the interview, Claimant reported that he was applying for benefits because of his "back and knees, sleep disorder and [being] nervous around people," and provided a brief history of his symptoms. (Tr. at 235). Claimant reported that his "pain difficulties increase his mood difficulties" and "estimated that about half of his mood related problems are pain related." (*Id.*). Regarding presenting symptoms, Claimant reported experiencing "constant, daily depressive symptoms," which began approximately 3-4 years prior but had become progressively worse over time, as well as "a poor appetite but his weight is stable, difficulty sleeping (due to pain or anxiety), loss of energy, feelings of worthlessness and guilt, recurrent thoughts of death, poor concentration, occasional irritability, increased nervousness and increased worrying." (*Id.*). Claimant reported that "due to pain and anxiety, he has difficulty getting to sleep and wakens through the night due to pain." (*Id.*). Regarding his anxiety, Claimant reported that he had "always been a nervous person," but that his anxiety became excessive when he began having chronic pain. (*Id.*). Reported symptoms included "excessive anxiety and worry, occurring more days than not, about his health, his child, financial problems, getting things done, and not being able to do the things he used to," as well as "difficulty controlling his worry, restlessness, feeling on edge, being easily fatigued, difficulty concentrating, muscle tension, and sleep disturbance." (Tr. at 235-36). Claimant also reported feeling useless, not "want[ing] to be around others because he is afraid they will judge him as being useless as well," and

avoiding social situations as much as possible. (Tr. at 236). Claimant reported no history of past counseling or past psychiatric hospitalizations, and was not currently receiving counseling. (*Id.*).

In his mental status examination, Claimant's "mood was depressed and anxious," while his "affect was restricted." (*Id.*). Regarding psychomotor activity, he "exhibited slight fidgeting during the evaluation and various pain behaviors," including "shifting of weight and having to stand." (Tr. at 237). Otherwise, Claimant's attitude/behavior, social interaction, speech, orientation, thought process, thought content, perception, insight, judgment, immediate memory, recent memory, remote memory, and concentration were all within normal limits, and he denied any suicidal/homicidal ideations. (Tr. at 236-37). Ms. Perdue diagnosed Claimant with "depressive disorder NOS" along Axis I, based upon his reports of anxiety and depressive symptoms, and opined that Claimant's prognosis was "fair" with appropriate treatment. (Tr. at 237).

Claimant reported activities of daily living consisting of watching television, listening to music, and caring for his child on weekends. (*Id.*). Claimant reported that he was able to make microwave and quick stovetop meals, sweep and dust, take quick shopping trips, complete personal grooming and hygiene tasks independently, handle his finances, and drive for short trips under 30 minutes, although his license was expired. (*Id.*). Claimant reported that he could no longer play cards, play pool, go bowling, hang out with his friends, or build model cars due to pain, weakness, and anxiety. (*Id.*). Although Claimant described himself as socially "withdrawn" and reported having no social activities, Ms. Perdue observed Claimant's social functioning, pace, and persistence to be within normal limits, and opined that Claimant was competent to manage his own finances. (Tr. at 237-38).

On May 7, 2010, G. David Allen, Ph.D. provided a psychiatric review technique based upon Ms. Perdue's evaluation. (Tr. at 240-53). Dr. Allen diagnosed Claimant with Depressive Disorder NOS, (Tr. at 243), but concluded that Claimant did not meet any of the mental impairment Listings as he was only mildly limited in his ability to maintain social functioning; had no restriction on activities of daily living or his ability to maintain concentration, persistence, or pace; and suffered from no episodes of extended decompensation. (Tr. at 250-51). Dr. Allen found Claimant to have "partial credibility" given that the "degree of functional impairment observed at CE [was] somewhat less than alleged on AFRQ and [Claimant had] no psych treatment." (Tr. at 252).

On January 25, 2011, James W. Bartee, Ph.D. provided a case analysis, in which he reviewed the medical evidence on file and affirmed as written Dr. Allen's opinion that Claimant has a non-severe mental impairment. (Tr. at 273).

### 2.  Physical Evaluations

On July 26, 2010, W. Roy Stauffer, M.D. conducted an internal medicine examination of Claimant, and provided an accompanying RFC opinion. (Tr. at 254-59). Claimant reported a history of carpal tunnel syndrome, back pain, and knee pain. (Tr. at 254). Claimant complained of "problems with pain in his left arm up to his shoulder," and difficulty sleeping related to his carpal tunnel, as well as constant pain radiating down his left leg to his knee and intermittent bilateral foot numbness, and bilateral knee pain accompanied by a lot of grinding and popping. (Tr. at 255).

Claimant's physical examination was essentially within normal limits as to his vital signs, HEENT, neck, skin, chest/lungs, heart, abdomen, and extremities. (Tr. at 255-56). Examination of Claimant's back reflected "tenderness over the lumbar spine" while his straight leg raise was "60° on the left associated with low back pain." (Tr. at

256). Examination of Claimant's joints reflected that Claimant "cannot fully extend the right fourth and fifth fingers, but no other deformity, heat, nodes, tenderness or redness" was observed, although Claimant did have "bilateral knee crepitus." (*Id.*). Claimant also had diminished right knee flexion to 130° (150° standard) due to pain; diminished left ankle dorsiflexion to 15° (20° standard); and diminished lumbar spine flexion to 60° (20° standard). (Tr. at 256, 258-59). Otherwise, Claimant had full range of motion without pain as to his shoulders, elbows, wrists, hips, and cervical spine. (*Id.*). Dr. Stauffer further observed that Claimant's gait was mildly antalgic and that he "tends to be bent over at the waist and seems to be in pain." (Tr. at 256). Claimant could "perform fine manipulation and gross dexterous movements with his hands." (*Id.*). Claimant could "knee squat only about one-half way down" and could "walk on heels and toes, although it causes low back pain." (*Id.*). Claimant's mental status was normal. (*Id.*).

Accordingly, Dr. Stauffer provided a diagnosis of bilateral carpal tunnel syndrome, "chronic back pain with possible left lower extremity radiculopathy," "bilateral knee pain probably secondary to degenerative joint disease," and a "history of recent seizures, uncontrolled, untreated." (*Id.*). Based upon his examination and diagnosis, Dr. Stauffer opined that Claimant could occasionally lift 20 lbs; frequently but not repetitively lift 10 lbs; stand and walk six hours in an eight-hour day with normal breaks; sit six hours in an eight-hour day with normal breaks; and push or pull occasionally, but not repetitively with his upper extremities. (*Id.*). Regarding postural limitations, Dr. Stauffer opined that Claimant would need to limit climbing ladders, ropes, and scaffolds; and could occasionally balance, stoop, kneel, crouch, and crawl. (Tr. at 256-57). Dr. Stauffer further opined that Claimant should not do anything

repetitively with his hands, but that he had no other manipulative limitations. (Tr. at 257). Regarding environmental limitations, Dr. Stauffer recommended that Claimant avoid heights, hazards, and commercial driving, and reiterated that Claimant should not climb ladders, ropes, or scaffolds at all due to his history of probable seizures. (T *Id.*).

On July 31, 2010, consultative physician Atiya M. Lateef, M.D. provided a Physical RFC opinion of Claimant based upon Dr. Stauffer's examination, (Tr. at 261-68), in which she opined that Claimant could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand and/or walk (with normal breaks) for a total of 6 hours in an 8-hour workday, sit (with normal breaks) for a total of 6 hours in an 8-hour workday, and had unlimited ability to push/pull. (Tr. at 262). Claimant could never climb ladders, ropes or scaffolds, but could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. (Tr. at 263). Claimant was limited in his fingering (fine manipulation), but was otherwise unlimited in his ability to reach all directions (including overheard), handling (gross manipulation), and feeling (skin receptors). (Tr. at 264). Dr. Lateef elaborated that Claimant had "minor limitation with fine manipulation" and recommended that Claimant "avoid repetitive or constant fine manipulation with hands." (*Id.*). Claimant had no visual or communicative limitations, (Tr. at 264-65). Dr. Lateef opined that Claimant should avoid all exposure to hazards such as machinery and heights, and avoid concentrated exposure to extreme cold and vibration, but that he could withstand unlimited exposure to extreme heat, wetness, humidity, noise, and fumes. (Tr. at 265). Dr. Lateef noted that "review of MER and ADL's supports partial credibility," (Tr. at 266), and therefore reiterated that Claimant's "physical RFC [was] reduced to light with postural, manipulative and environmental limitations as mentioned." (Tr. at 268).

On February 1, 2011, Narendra Parikshak, M.D. provided a case analysis in which she reviewed the medical evidence on file and affirmed Dr. Lateef's RFC opinion on the ground that there was "no new medical evidence on record since [Claimant's] last RFC to suggest increased functional impairment." (Tr. at 274).

## VI.   <u>Scope of Review</u>

The issue before this Court is whether the final decision of the Commissioner denying Claimant's application for benefits is supported by substantial evidence. The Fourth Circuit has defined substantial evidence as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the administrative law judge, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court will not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Id.* Instead, the Court's duty is limited in scope; it must adhere to its "traditional function" and "scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). Thus, the ultimate question for the Court is not whether the Claimant is disabled, but whether the decision of the Commissioner that the Claimant is not disabled is well-grounded in the evidence, bearing in mind that "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner]." *Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir. 1987).

The Court has considered Claimant's challenges and finds them unpersuasive. To the contrary, having analyzed the record as a whole, the Court concludes that the finding of the Commissioner that Claimant is not disabled is supported by substantial evidence.

## VII.   <u>Analysis</u>

Claimant argues that the Commissioner's decision is not supported by substantial evidence, and insists that his physical and mental impairments in combination prevent him from engaging in substantial gainful activity. (ECF No. 11 at 4-6). In support of his position, Claimant argues that the ALJ improperly assessed his credibility by failing to apply the correct legal standard for assessing credibility and by failing to adequately articulate the reasons for discounting Claimant's credibility. (*Id.* at 6-8). Having carefully reviewed the ALJ's decision, the Court affirms the ALJ's credibility determination.

Pursuant to the Regulations, the ALJ evaluates a claimant's report of symptoms using a two-step method. 20 C.F.R. §§ 404.1529, 416.929. First, the ALJ must determine whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. *Id.* §§ 404.1529(a), 416.929(a). That is, a claimant's "statements about his or her symptoms is not enough in itself to establish the existence of a physical or mental impairment or that the individual is disabled." SSR 96-7p, 1996 WL 374186, at *2. Instead, there must exist some objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" which demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. §§ 404.1529(b), 416.929(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* §§ 404.1529(a), 416.929(a). If the intensity, persistence or severity of the symptoms cannot be established by objective medical evidence, the ALJ must assess the credibility of any statements made by the claimant to support the alleged disabling effects. SSR 96-7P, 1996 WL 374186, at *2. In evaluating a claimant's credibility regarding his or her symptoms, the ALJ will consider "all of the relevant evidence," including (1) the claimant's medical history, signs and laboratory findings, and statements from the claimant, treating sources, and non-treating sources, 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1); (2) objective medical evidence, which is obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, *id.* §§ 404.1529(c)(2), 416.929(c)(2); and (3) any other evidence relevant to the claimant's symptoms, such as evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and any other factors relating to functional limitations and restrictions due to the claimant's symptoms. *Id.* §§ 404.1529(c)(3), 416.929(c)(3); *see also Craig v. Chater*, 76 F.3d 585, 595 (4th Cir. 1996); SSA 96-7P, 1996 WL 374186, at *4-5. In *Hines v. Barnhart*, the Fourth Circuit Court of Appeals stated that:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges he suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ. SSR 96-7P, 1996 WL 374186, at *6.

Social Security Ruling 96-7p provides further guidance on how to evaluate a claimant's credibility. For example, "[o]ne strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." *Id.* at *5. Likewise, a longitudinal medical record "can be extremely valuable in the adjudicator's evaluation of an individual's statements about pain or other symptoms," as "[v]ery often, this information will have been obtained by the medical source from the individual and may be compared with the individual's other statements in the case record." *Id.* at *6-7. A longitudinal medical record demonstrating the claimant's attempts to seek and follow treatment for symptoms also "lends support to an individual's allegations. . . for the purposes of judging the credibility of the individual's statements." *Id.* at *7. On the other hand, "the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints." *Id.* Ultimately, the ALJ "must consider the entire case record and give specific reasons for the weight given to the individual's statements." *Id.* at *4. Moreover, the reasons given for the ALJ's credibility assessment "must be grounded in the evidence and articulated in the determination or decision." SSR 96-7p, 1996 WL 374186, at *4.

When considering whether an ALJ's credibility determinations are supported by substantial evidence, the Court does not replace its own credibility assessments for those of the ALJ; rather, the Court scrutinizes the evidence to determine if it is sufficient

to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to credibility, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

Here, the ALJ provided an overview of Claimant's testimony, (Tr. at 16), which he then compared to the relevant medical evidence and consultative evaluations  in order to assess Claimant's credibility. (Tr. at 17-20). The ALJ found that Claimant's impairments could reasonably be expected to cause the symptoms he alleged, but that Claimant's statements concerning the intensity, persistence and limiting effects of these symptoms were only partially credible. (Tr. at 19). The ALJ observed that Claimant's claims of disabling symptoms were inconsistent with his continued activities of daily living, which included caring for his ten-year-old son, taking care of personal needs and household chores, driving and shopping, and managing his finances. (*Id.*). Furthermore, the ALJ observed that "there is very little medical evidence in the file" as well as a "four-year gap between treatments," noting that "the fact that the claimant has had little treatment for his conditions calls his credibility into question." (*Id.*). The ALJ added that Claimant "alleged he has no money for treatment" but testified to smoking a pack of cigarettes per day, the costs of which amounted to over $1,800 per year. (*Id.*).

In Claimant's view, it is "difficult to understand how the [ALJ] concluded that Plaintiff can perform light and sedentary work" in view of objective medical evidence of Claimant's chronic pain. (ECF No. 11 at 7-8). Claimant argues that Dr. Stauffer's

physical examination, Ms. Perdue's mental evaluation, and his 2005 and 2006 medical records all constitute objective evidence substantiating Claimant's allegations of disabling impairments. (*Id.* at 5). Looking first at Ms. Perdue's mental evaluation, the undersigned notes that Ms. Perdue did not evaluate the effect of Claimant's impairments on his ability to work. She merely assessed Claimant with Depressive Disorder NOS and observed that he exhibited slight fidgeting and certain pain behaviors. (Tr. at 237). However, Claimant reported no history of past mental health treatment, and Ms. Perdue described his prognosis as fair with appropriate treatment. (Tr. at 236-37). Ms. Perdue's observations regarding Claimant's fidgeting and pain behaviors hardly demonstrate that Claimant was unable to perform light and sedentary work, particularly given the extensive activities of daily living that he reported during the evaluation. (Tr. at 237). Similarly, while Dr. Stauffer's physical evaluation reflects medically determinable impairments relating to Claimant's back, hands, and knee, it does not support Claimant's testimony of *disabling* symptoms of impairments. (Tr. at 254-59). Indeed, Dr. Stauffer himself provided a physical RFC opinion, which included limitations corresponding with "light" level work, (Tr. at 256), and was subsequently affirmed by a second consultative physician. (Tr. at 274). Finally, Claimant's 2005 and 2006 MRI's are entirely insufficient to demonstrate that Claimant was incapable of substantial gainful activity, as they predate his alleged onset of disability by at least 3 years. In fact, the record reflects that despite radiographic evidence of disc degeneration, Claimant continued to work throughout this period and beyond. (Tr. at 180, 191, 306). In short, it is clear that the ALJ conducted a thorough analysis of the relevant evidence, appropriately weighed the medical source opinions, and provided a logical reason for discounting the credibility of Claimant's statements regarding the

intensity, persistence, and limiting effects of his symptoms, in accordance with the applicable Regulations.

Other errors Claimant assigns to the ALJ's credibility determination are likewise meritless. Claimant argues that under the "mutually supportive test" recognized in *Coffman v. Bowen*, 829 F.2d 514 (4th Cir. 1987), he satisfies the requirements of 42 U.S.C. § 423(d)(5)(A) because his testimony is supported by objective medical evidence. (ECF No. 11 at 7). Claimant misinterprets the holding in *Coffman.* There, the issue was not whether the ALJ erred in assessing the claimant's credibility, but whether the ALJ applied the appropriate legal standard in weighing the treating physician's opinion that the claimant was disabled from gainful employment. *Coffman*, 829 F.2d at 517-18. The Fourth Circuit found that the ALJ had misapplied the relevant standard by discounting the physician's opinion due to the alleged lack of corroborating evidence, when the correct standard was to give the opinion great weight *unless* persuasive contradictory evidence was present in the record. *Id.* at 518. The Fourth Circuit then pointed out that evidence supporting the physician's opinion, in fact, existed in the record, noting "[b]ecause Coffman's complaints and his attending physician's findings were mutually supportive, they would satisfy even the more exacting standards of. . . 42 U.S.C. § 423(d)(5)(A)." *Id. Coffman* offers no applicable "test" for assessing a claimant's credibility and, consequently, is inapposite. As the written decision in the present case plainly reflects, the ALJ applied the correct two-step process in determining Claimant's credibility.

Claimant also contends that the ALJ's use of "boilerplate" credibility language warrants remand on the ground that such language "provides no basis to determine what weight the [ALJ] gave the Plaintiff's testimony." (ECF No. 11 at 8). It is well

established that "ALJ's have a duty to explain the basis of their credibility determinations, particularly where pain and other nonexertional disabilities are involved." *Long v. United States Dep't of Health and Human Servs.*, No. 88-3651, 1990 WL 64793, at *2 n.5 (4th Cir. May 1, 1990). Social Security Ruling 96-7p instructs that "[w]hen evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individuals statements." SSR 96-7p, 1996 WL 374186, at *4. Moreover, the ALJ's credibility finding "cannot be based on an intangible or intuitive notion about an individual's credibility." *Id.* Rather, the reasons given for the ALJ's credibility assessment "must be grounded in the evidence and articulated in the determination or decision." *Id.* Thus, a "bare conclusion that [a claimant's] statements lack credibility because they are inconsistent with 'the above residual functional capacity assessment' does not discharge the duty to explain." *Kotofski v. Astrue*, Civil No. SKG-09-981, 2010 WL 3655541, at *9 (D. Md. Sept. 14, 2010); *see also Stewart v. Astrue*, Action No. 2:11-cv-597, 2012 WL 6799723, at *15 n.15 (E.D.Va. Dec. 20, 2012). To the contrary, the decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186, at *4.

The ALJ admittedly used "boilerplate" language in finding that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment." (Tr. at 19). However, the ALJ did not stop his analysis with only that bare

conclusion. As discussed above, the ALJ went on to explain that Claimant's ongoing activities of daily living, his lack of treatment history, and his claims of financial difficulty despite his costly smoking habit all tended to undermine his credibility. (Tr. 19). The ALJ's credibility finding was sufficiently articulated, as he explained his rationale with references to the specific evidence that informed his decision.

Consequently, the Court finds that the ALJ followed the proper agency procedures in assessing Claimant's credibility and weighing medical source opinions.

## VIII.  <u>Conclusion</u>

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to all counsel of record.

**ENTERED:**  May 2, 2014

Cheryl A. Eifert
United States Magistrate Judge